JjSEXTON, Judge.
The Louisiana Supreme Court vacated in part, affirmed in part, and remanded our previous holding in Stapleton v. Great Lakes Chemical Corporation, 616 So.2d 1311 (La.App.2d Cir.1993). In that opinion, we held, in relevant part, that the trial judge erred in finding separate causes of action in both the tort case and the worker’s compensation intervention and thereby finding the plaintiff, Stapleton, and defendant, Henderson, each 50 percent at fault in causing the accident in question, in contradiction to the finding of the jury allocating no fault to either defendant and rejecting the demands of plaintiff. We affirmed the trial court’s determination that defendant, Brown, was not negligent. We further found that the jury was not clearly wrong in its rejection of plaintiffs demands and affirmed the judgment rendered on the jury verdict. The higher court agreed with our -holding finding error in the trial *302 court’s belief that the tort action and the intervention represented separate causes of action, 627 So.2d 1358. It further affirmed the findings that defendant, Brown, was not negligent. The court disagreed, however, with our determination that the jury verdict was not clearly wrong in finding Stapleton and Henderson free of fault. Accordingly, the court vacated and set aside both this court’s, and the trial court’s holdings, except insofar as Brown was found not at fault, and rendered judgment assessing Henderson 75 percent at fault and Stapleton 25 percent at fault. This matter was remanded for the calculation and award of damages in accord with the percentages of fault allocated to the two truck drivers and the rendering of a proper verdict as to the intervention. We amend the judgment on the intervention and affirm as amended. We also render judgment for plaintiffs.
WORKER’S COMPENSATION INTERVENTION
The rendering of a proper verdict as to the intervention is not difficult. The trial court originally rendered judgment in favor of intervenor in the amount of $102,713.25, plus legal interest. This amount represents 50 percent of all worker’s compensation benefits paid and corresponds with the original 50 percent fault allocation originally set by the trial judge against Stapleton and Henderson.
|2The rights of an employer to recover compensation benefits paid to an injured employee are identical to the employee’s right to recover from the third party tortfeasor, and where the employee’s recovery is reduced due to comparative negligence, the employer’s recovery is reduced by the same percentage. Chatelain v. Project Square 221, 505 So.2d 177 (La.App. 4th Cir.1987), writs denied, 508 So.2d 71, 74 (La.1987). Because the supreme court has assessed Staple-ton’s fault at 25 percent and Henderson’s fault at 75 percent, intervenor, Travelers Insurance Company, is entitled to judgment against defendants, Max Henderson, Great Lakes Chemical Corporation, and Old Republic Insurance Company in the amount of $154,069.87, together with legal interest thereon.
DAMAGES
A proper calculation of damages is necessary pursuant to the higher court allocation of fault. At the time of trial, Mr. Stapleton was 40 years old; on the date of the accident, he was 36. He is married and has two children from this union. He also has four children and his wife has two children from previous marriages. Mr. Stapleton dropped out of high school, but later earned his GED. He had been in the truck driving profession since 1970 and was employed during that time by several companies.
Following the accident in question, Staple-ton was transported to Lincoln General Hospital in Ruston and then to St. Francis Hospital in Monroe where he remained for one week. Eight days after the accident, on January 17, 1988, Stapleton was transferred to St. Charles General Hospital Emergency Room in New Orleans. From the time of the accident, Stapleton experienced severe pain in his neck area and headaches radiating from the base of the skull at the top of the neck. Upon his admission to St. Charles General, plaintiff remained on various pain medications which were affording him no relief. Dr. S. Henry LaRocca saw plaintiff in the emergency room on January 17, 1988, and has continued to treat plaintiff since that time. On this date, plaintiff experienced severe restriction of motion in all directions, with muscle | sspasms in the back of his neck. Compression of the head down onto the neck produced the neck pain of which plaintiff complained. Because the doctor suspected both a head injury as well as a intervertebral disc injury, an MRI was performed as well as an EEG. The MRI was normal and the EEG revealed that indeed plaintiff has experienced a head injury which caused brain inflammation. An EMG was performed in addition to the other tests and at that time, the results were normal. Plaintiff remain hospitalized for a period of four days.
On February 24, 1988, he returned to Dr. La Rocca’s office for an office visit and continued to do poorly with complaints of pain in the neck and headaches. Because plaintiffs condition was worsening, Dr. LaRocca once again admitted plaintiff to the hospital and *303 conducted various X rays and a CAT scan. These were normal. Another EMG was performed and demonstrated that Stapleton had cervical disc disruptions at C5-6 and C4-5. Surgery was performed, removing the disrupted discs. Plaintiff remained in the hospital another five days, without serious complication.
He was once again seen by Dr. LaRocca in the emergency room of St. Charles General on March 15, 1988, complaining of neck spasms. The doctor prescribed pain medication without admission to the hospital. On March 22, 1988, plaintiff returned to the hospital with an increase in neck pain and was admitted. After release, plaintiff made regularly scheduled visits to Dr. LaRocca and experienced a gradual lessening of pain in the neck area.
On April 25, 1988, plaintiff began to complain of lower back pain and was diagnosed as having spondylolisthesis at L5-S1, a condition existing since childhood, but which had remained asymptomatic prior to this time. He visited Elmwood Hospital, Dr. LaRocca’s new situs, for X rays which revealed the spondylolisthesis and a ruptured disc above it at L4-5. In September of 1988, the pain worsened. On November 3, 1988, Stapleton underwent back surgery for removal of the disc herniation and insertion of a bone graft. Mr. Stapleton continued in pain and his body rejected the bone graft. Accordingly, on April 26,1989, an anterior lumbar fusion was Uperformed for correction of the bone graft rejection. He was released from the hospital seven days later and continued to see Dr. LaRocca.
The anterior fusion was successful. Although, in March of 1990, plaintiff continued with some pain in his back and was now experiencing pain in his right leg, both of which were treated with medication. In May of 1990, however, Stapleton returned to Dr. LaRocca’s office with an intense onset of pain in the legs, which Dr. LaRocca diagnosed as an incurable nerve condition called radiculo-pathy which results from nerve damage. At that time, he was given narcotics for control of the problem, which proved unsuccessful. He continued on pain medication through July of 1990. As a preferable alternative to continued use of heavy doses of narcotics, Dr. LaRocca opted for implantation of a dorsal column stimulator, a device used to control the pain. This surgery occurred on August 2,1990. The device is activated by Stapleton as needed to send an electrical impulse to his spine which in turn masks the pain in the lower limbs. This device must be surgically replaced every five years and continual monitoring of it by a physician is necessary. Sta-pleton experienced an inflammatory reaction to the incision resulting in the formation of a bursa (sac of fluid) and a debriding procedure was necessary on August 21, 1990.
Stapleton now remains free of symptoms in the neck area. He has minimal complaints regarding his back. In the leg area, Staple-ton experiences pain as long as his pain device is deactivated. When utilized, the pain device reduces only the intensity of the pain.
CAUSATION
In a personal injury suit, the plaintiff bears the burden of proving the causal relationship between the accident and the injuries of which plaintiff complains. Further, the defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. American Motorist Insurance Co. v. American Rent-all, Inc., 579 So.2d 429 (La.1991); Bade v. Wade, 607 So.2d 927 (La.App. 2d Cir.1992). Where a defendant aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Insurance Co. v. American Rent-all, Inc., supra; Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Bade v. Wade, supra. A personal injury plaintiffs disability is presumed to have resulted from an accident if before the accident the plaintiff was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, provided that medical evidence shows there to be a reasonable possibility of a causal connection between the accident and *304 the disabling condition. Bacle v. Wade, supra.
The only testimony relating to impairment was that of Dr. LaRocca, plaintiffs treating physician, who testified that in his opinion, Stapleton sustained a 40 percent permanent partial disability of the body, which, according to American Medical Association tables, includes a 30 percent impairment for the two-segment fusion in the lower back and 10 percent for the neck fusion. Dr. LaRocca indicated that the plaintiff can never drive a truck again and should not engage in any employment which involves lifting, carrying, pushing, pulling, crawling, or climbing. He did note that plaintiff could work, although only within these restrictions.
We find plaintiff has sufficiently demonstrated that his injuries were caused by the accident in question. From the undisputed testimony of Dr. LaRocca, the record shows that the neck and head injuries for which plaintiff was initially admitted to the hospital were caused by the collision. The facts support plaintiffs assertions that he had never experienced this type of injury prior to the accident. Additionally, even though the record clearly shows that Stapleton’s spondylo-listhesis existed prior to the accident, we accept the testimony of Dr. LaRocca that the accident aggravated the condition, increasing its degenerative process. This conclusion is supported by the fact that plaintiff had not experienced any pain or symptoms prior to the accident, and the existence of a ruptured disc above the spondylolisthesis, which indicates the overall impact that the accident had on that area. Defendants take Mr. Stapleton as they find him and are responsible for these natural and probable consequences of their unegligence. Additionally, the nerve damage resulted from the above complications and can certainly be said to have been proximately caused by the accident. This evidence and testimony easily demonstrate a reasonable possibility of causation.
GENERAL DAMAGES
In this case, the evidence shows that plaintiff experienced neck and back injuries which led to nerve damage. He underwent three surgeries. Stapleton will require replacement of the dorsal column stimulator every five years. As a result of these procedures, he experienced substantial pain and suffering. He remains in pain and on pain medication due to these injuries. The evidence shows that Stapleton will never be released from medical care due to the implantation device. Although he has reached maximum recovery, he will always experience some pain. His overall quality of life has been diminished substantially by this accident and the resulting injuries. He will never again be able to engage in the only occupation for which he had training and will be forced to re-enter the employment market only after job training. His marital relationship with his wife has been affected as has his relationship with his children.
While damage awards should be determined by the facts and circumstances of each case and the methodology of awarding damages requires more than a mere comparison of other cases with similar facts, a review of similar awards aids in our analysis. In Johnson v. Dufrene, 433 So.2d 1109 (La.App. 4th Cir.1983), writ denied, 441 So.2d 765 (La.1983), a 27-year-old plaintiff was awarded $300,000 general damages as the result of a rear-end collision in which plaintiff received cervical and back injuries which resulted in a 40 to 45 percent functional disability, thus preventing plaintiff from performing physical labor or lifting objects heavier than thirty pounds. In Thibodaux v. Acme Truck Lines, Inc., 443 So.2d 716 (La.App. 5th Cir.1983), writ denied, 445 So.2d 439 (La.1984), plaintiff, a farmer, was involved in an automobile accident causing two ruptured discs which required surgery. Plaintiff would never be able to farm again and the court awarded a total of $350,000 for pain and suffering. In Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3rd Cir.1987),7 writ denied, 515 So.2d 807 (La.1987), plaintiff, a manual laborer, was injured when a large truck backed into the vehicle plaintiff was entering, causing disc problem which required surgery and resulted in a 20 percent permanent disability which prevented plaintiff from returning to manual labor. The trial judge awarded $400,000 for physical and mental pain and suffering. In Hoffman v. Travelers Insurance Company, 587 So.2d 143 (La.App. 4th Cir.1991), a 37-year-old plaintiff was awarded $440,000 for past and future pain, suffer *305 ing, and mental anguish after being injured in a motor vehicle collision which caused ruptured and bulging cervical discs necessitating a fusion and bone graft and which resulted in a 15 to 20 percent disability rating.
Individualizing this award to this plaintiff for the consequences of this accident, we conclude that an award of $400,000 for physical and mental pain and suffering is appropriate. This award is subject to a reduction of 25 percent for Mr. Stapleton’s allocation of fault.
CONSORTIUM
Plaintiffs further request an award of consortium on behalf of Mrs. Judy Stapleton. The elements of loss for the analysis of a consortium award include love and affection, society and companionship, sexual relations, performance of material services, right of support, aid and assistance, and felicity. Bacle v. Wade, 607 So.2d 927 (La.App. 2d Cir.1992); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). The evidence indicates that Mrs. Stapleton took complete care of her husband after the accident. She was responsible for getting him back and forth to the New Orleans hospital and acted in a nursing capacity in caring for her husband. This is supported by the testimony of both Mr. and Mrs. Stapleton. Both parties also indicated that Mr. Stapleton’s injuries have affected their sexual relationship, with Mr. Stapleton noting that he is sometimes unable to sleep in the same bed with his wife due to the pain. He further testified that he could no longer take his wife dancing or bowling, activities they enjoyed prior to the accident. Both noted that Mr. Stapleton spends most of his time idle, performing only minimal tasks at the request of his wife. Mrs. IsStapleton notes a change in her husband’s demeanor due to his short-temperdness since the accident and the accompanying injuries. His relationship with his children has changed as well due to his inability to participate in sports and activities which involve running, bending, or stooping.
Under these circumstances, we feel that an award of $20,000 is warranted for loss of consortium. The award is, of course, subject to reduction for Mr. Stapleton’s percentage of negligence.
SPECIAL DAMAGES
Plaintiffs request an award of past and future medical expenses incurred as a result of this accident. The record in this case shows that the total medical expenses incurred by Stapleton, supported by hospital and medical bills, was $142,653. Accordingly, we award this amount in past medical expenses.
An injured party is also entitled to future medical expenses which will be incurred as the result of an accident. Thames v. Zerangue, 411 So.2d 17 (La.1982); Nichols v. Stone Container Corp., 552 So.2d 688 (La.App. 2d Cir.1989), writ denied, 556 So.2d 1262 (La.1990). In this case, the testimony of Dr. LaRocca shows that it will be necessary for plaintiff to have his pain device replaced every five years. Dr. LaRocca testified that the procedure alone would cost approximately $500.00. The testimony of Dr. Charles Bettinger, plaintiffs expert in the field of economics in computation of past and future losses, testified that the total future medical expenses for this procedure every five years would be $5,697 based upon an estimate of a $1,000 cost per procedure with inflationary calculations included and a 33.6 year life expectancy, at the time of trial, based upon Stapleton’s forty years. We find that $5,697 is a reasonable award for future medical expenses in light of the foregoing uncontradicted evidence.
LOST WAGES
Awards for future lost wages and lost earning capacity are inherently speculative and cannot be predicted with absolute certainty. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir. 1984). Loss of earning capacity is based upon the injured person’s ability to earn money rather than what he actually earned before the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Bade v. Wade, supra. Thus, actual earnings are not necessarily determinative; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he *306 may never have seen fit to take advantage of that capacity. The theory is that the injury deprived him of a capacity he was entitled to enjoy even though he never profited from it monetarily. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Nevertheless, actual earnings before and after the accident may be a useful measure of lost earning capacity. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980). Loss of wages can be computed on the amount that plaintiff would in all probability have been earning at the time of trial, and damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Spivey v. Super Valu, 575 So.2d 876 (La.App. 2d Cir.1991); Spangler v. North Star Drilling Company, 552 So.2d 673 (La.App. 2d Cir.1989).
In this case Dr. Charles Bettinger, plaintiffs expert, presented the only testimony relating to this issue. Based upon Mr. Stapleton’s tax returns from 1987, as well as his W-2 form for 1988, Dr. Bettinger estimated that Stapleton had an earning capacity of $650 per week. This calculation was based upon what Mr. Stapleton earned at the time of the accident. Dr. Bettinger utilized the Culver Method to determine future lost wages. This method eliminates the inflation component of calculation and focuses on a future productivity rate of between 1.0 and 2.0 percent, and the real interest rate of 1.92 percent. Based then, upon the 20.4 year work life expectancy of Mr. Stapleton at age 40 (his age at the time of trial) and a 50-week work year, discounted to present value, Dr. Bettinger determined that Stapleton had experienced a future earning loss of $529,454, in addition to associated cash benefits - (fringes) calculated at 25 percent of gross wages, including employer’s contribution to Jipsocial security, replacement of hospitalization and insurance, federal and state unemployment compensation of $157,361. Therefore, in his estimation, the total future loss was $786,806 should Stapleton never return to work. Assuming that Stapleton would be able to return to minimum wage employment immediately, without further training, Dr. Bettinger subtracted the sum of $160,899, including 15 percent fringe benefits. This computes to future wage loss of $625,907.
Dr. Bettinger next calculated past lost wages utilizing the $650 per week sum and determined that Stapleton had lost a total of $115,753 in cash earnings and $28,938 in cash benefits. Therefore, his calculation of total past earning loss equalled $144,688 from the date of the accident to the time of trial.
Our review of this record reveals that Mr. Stapleton was earning $650 per week at the time of this accident on January 8, 1988. Trial of this matter was held in September of 1991. We find it reasonable to conclude, when considering his work history, that Sta-pleton would have remained employed by Martin Gas during this three-year period. Because this award can be projected with reasonable mathematical certainty, we accept the projections of Dr. Bettinger on the issue of past lost wages and award the sum of $144,688.
While Mr. Stapleton’s increase in salary from earlier years demonstrates a commendable increase in productivity at the time of the accident, in light of his past work history and the nature of his occupation, we cannot agree that Dr. Bettinger’s calculations are the probable measure of loss. Stapleton’s work history shows that his employment as a truck driver was sporadic at times. Further, his rate of pay was inconsistent throughout the years. In the years previous to his employment with Martin Gas, he had earned substantially less than what he earned in the four months prior to the accident. He also had been unemployed for some time prior to his re-employment with Martin Gas. His tax returns reveal work for various companies throughout one year periods. He had previously worked for Martin Gas, but was laid off in 1983. After that time he went to work for Snyder National, but was forced to leave the | ncompany due to medical problems which prevented him from driving long hauls. He then worked for ConAgra driving short hauls until the time that he was able to resume the long trips. At that time he was employed by Transportation Enterprises which went out of business. He remained unemployed until August of 1987 when he regained employment with Martin Gas Corporation. This *307 work history reflects the irregular nature of the trucking business.
Nevertheless, as a result of the accident, Stapleton will not be able to resume truck driving. Rather, he will be forced to seek minimum wage sedentary employment which falls within his physical restrictions. He will therefore experience a substantial decrease in income and fringe benefits. In light of the evidence before us, we find the sum of $400,-000 for lost future wages appropriate. This amount, like the others, will be reduced by plaintiffs comparative fault.
CONCLUSION
In summary, we will amend the trial court judgment to award the amount of $154,-069.87, together with legal interest thereon in favor of intervenor, Travelers Insurance Company, and against defendants, Max Henderson, Great Lakes Chemical Corporation, and Old Republic Insurance Company, for compensation benefits previously paid and, in addition,'75 percent of any compensation benefits paid to plaintiff, Johnny Staple-ton, after September 30, 1991. Further, we award the plaintiff, Johnny Stapleton, the amount of $400,000 in general damages, $148,350 in special damages, $144,688 in past lost wages, and $400,000 in lost future wages for a total of $1,087,341. We additionally award the plaintiff, Judy Stapleton; $20,000 for loss of consortium. The awards in favor of Mr. and Mrs. Stapleton are, of course, subject to a reduction of 25 percent, representing the fault assigned to the plaintiff Johnny Stapleton by the Louisiana Supreme Court.
DECREE
Paragraph one of the judgment of the trial court on the intervention in favor of the intervenor, TRAVELERS INSURANCE COMPANY, dated April 11, 1992, is | ^hereby amended to award intervenor ONE HUNDRED FIFTY-FOUR THOUSAND SIXTY-NINE and 87/100 DOLLARS ($154,-069.87) (rather than $102,713.25), together with legal interest from the date of judicial demand until paid. Paragraph two of that judgment of intervention is amended to order defendants to pay intevenor 75 percent (75%)' of all future compensation benefits (rather than . 50 percent). As amended, that judgment is affirmed.
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff, JOHNNY STAPLETON, and against defendants, MAX HENDERSON, GREAT LAKES CHEMICAL CORPORATION, and OLD REPUBLIC INSURANCE COMPANY, in solido, in the sum of EIGHT HUNDRED FIFTEEN THOUSAND FIVE HUNDRED FIVE and 75/100 DOLLARS ($819,778.50) (after reduction of 25 percent), with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of the plaintiff, JUDY STAPLETON, and against defendants, MAX HENDERSON, GREAT LAKES CHEMICAL CORPORATION, and OLD REPUBLIC INSURANCE COMPANY, in solido, in the sum of FIFTEEN THOUSAND and No/ 100 DOLLARS ($15,000.00) (after reduction of 25 percent), .with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the defendants, MAX HENDERSON, GREAT LAKES CHEMICAL CORPORATION, and OLD REPUBLIC INSURANCE COMPANY, be cast with all costs of court.
JUDGMENT OF INTERVENTION AMENDED AND AFFIRMED AS AMENDED; JUDGMENT RENDERED FOR PLAINTIFFS.